UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

| | |
|---|---|
| **LOURDES DEL ROSARIO FONTANILLAS-LOPEZ,** Plaintiff, v. **MOREL BAUZA CARTAGENA & DAPENA LLC, ET AL,** Defendants. | CIV. NO. 12-1206(PG) |

## OPINION AND ORDER

Plaintiff Lourdes del Rosario Fontanillas Lopez (hereinafter "Plaintiff" or "Fontanillas"), along with her parents Mildred Milagros Lopez and Luis Alfredo Fontanillas,[1] filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* ("Title VII"), against Plaintiff's former employer Morell, Bauzá, Cartagena & Dapena ("MBCD" or "the Firm") and individual defendants Pedro Antonio Morell ("Morell"), Antonio Bauzá ("Bauzá"), Edgardo Cartagena ("Cartagena"), Ramon E. Dapena ("Dapena"), and Lourdes M. Vázquez ("Vázquez") (collectively referred to as "Defendants") alleging she was the victim of discrimination on the basis of gender, a hostile work environment and retaliation for engaging in protected conduct. See Docket No. 1. In summary, Fontanillas claims that the Defendants discriminated against her, subjected her to a hostile work environment in her employment and eventually terminated her because she is a woman and in retaliation for complaining of a hostile work environment and sexual harassment. See id.

The Plaintiff also invoked supplemental jurisdiction over her state law claims under Law No. 100 of June 30, 1959 ("Law No. 100"), P.R. Laws Ann. tit. 29, § 146, *et seq.;* Law No. 17 of April 22, 1988 ("Law No. 17"), P.R. Laws Ann. tit. 29, § 155 *et seq.;* Law No. 69 of July 6, 1985 ("Law No. 69"), P.R. Laws Ann. tit. 29, § 1321 *et seq.;* Law No. 80 of May 30, 1976 ("Law No. 80"), P.R.

---

[1] Mildred Milagros Lopez and Luis Alfredo Fontanillas requested the dismissal with prejudice of their claims and partial judgment was entered accordingly on November 9, 2012, see Docket No. 33.

LAWS ANN. tit. 29, § 185, *et seq.;* and Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. LAWS ANN. tit. 31, § 5141.

Before the court is the Defendants' Motion for Summary Judgment (Docket No. 63), Plaintiff's Opposition (Docket No. 75) and Defendants' Reply (Docket No. 82). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the court **GRANTS** the Defendants' motion for the reasons explained below.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible

inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## II. FACTUAL FINDINGS

Before setting forth the facts found by this court to be undisputed and relevant to the matter at hand, we must first address several compliance issues presented to the court when reviewing Plaintiff's statements of facts.

In addition to Federal Rule of Civil Procedure 56, the local rules of civil procedure govern the parties' submissions of summary judgment materials. See L.Cv.R. 56 (D.P.R.2009). Regarding the filing of opposing statements of material facts, Local Rule 56(c) states as follows:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

L.Cv.R. 56(c). "This separate section containing additional facts is necessary to allow the moving party to reply to those additional facts and to allow the court to easily determine the disputed facts. … Therefore, a party may not include numerous additional facts within its opposition to the moving party's statements of uncontested facts." Malave-Torres v. Cusido, 919 F.Supp.2d 198, 207 (D.P.R. 2013) (internal citations omitted).

In their reply, the Defendants complain that, in her attempt to controvert the facts the Defendants proposed, Plaintiff failed to set forth her additional facts in a separate section. See Docket No. 82 at pages 2-3. After reviewing the Plaintiff's objections to the Defendants' statement of uncontested facts (Docket No. 34-1), the court found that the Plaintiff, in fact, did not include a separate section of additional facts. Instead, she proposed additional facts in the same numbered paragraphs wherein she

admitted, denied or qualified the Defendants' proposed factual statements. And while the court understands that a party asserting that a fact is genuinely disputed must support the assertion with record citations, see FED.R.CIV.P. 56(c)(1), the Plaintiff, for the most part, incorporated her own version of events in the paragraphs where she opposed the Defendants', as well as in the body of her response memorandum. The court is under no obligation to "sift through Plaintiff's responses to locate additional facts." Malave-Torres, 919 F.Supp.2d at 207. Therefore, the court will "disregard any additional facts provided by [Plaintiff] when denying or qualifying [Defendants'] statement of uncontested facts." Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 137 (1st Cir.2012).

The Defendants also complain in their reply that in her opposition, the Plaintiff resorts to a "post-deposition, self-serving, sham affidavit," see Docket No. 82 at page 6, that contains speculative and conclusory statements, id. at page 16. "It is settled that '[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.'" Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20 (1st Cir.2000) (citing Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir.1994)). Nonetheless, "[e]ven a clearly self-serving affidavit constitutes evidence which the court must consider when resolving summary judgment motions." Malave-Torres, 919 F.Supp.2d at 204 (citing Cadle Co. v. Hayes, 116 F.3d 957, 961 n. 5 (1st Cir.1997) ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.")). In determining whether an affidavit is admissible, the analysis of whether the affidavit should be stricken from a party's opposition to a motion for summary judgment does not simply end with a determination that the affidavit is self-serving inasmuch as the court must determine whether it is also sham. See id.

After carefully reviewing the testimony given in Plaintiff's deposition versus her statement under penalty of perjury, the court disregarded the content of the latter only to the extent it was either incongruent with her deposition testimony or the matter in question was the subject of extensive questioning during deposition, yet she decided to elaborate further in her affidavit. The court, however, considered the Plaintiff's affidavit when it

properly addressed, qualified or denied the content of a statement of fact set forth by the Defendants and, to the court's knowledge, the matter was not subject to questioning during her deposition. The court also considered the content of Plaintiff's affidavit when it properly clarified her response during deposition.

In accordance with the foregoing, the court found the following relevant facts were undisputed:

1. In 2004, Fontanillas was hired by co-defendant Bauzá to work at Goldman, Antonetti & Cordova, PSC (hereinafter "GAC") as an associate.

2. Bauzá was always one of Plaintiff´s supervisor while she worked at GAC.

3. Plaintiff was promoted to basic partner at GAC in December of 2008. As Chair for the Tax Department at GAC, it was co-defendant Bauzá who Plaintiff identified as the one who should have recommended her to become partner in accordance with how the firm worked.

4. During her work at GAC, Plaintiff had an incident with attorney Roxanna Cruz ("Cruz"), another member of GAC's tax department, during which the latter screamed at Plaintiff. Plaintiff described this incident as embarrassing and not professional.

5. Plaintiff spoke about this incident with attorney Bauzá.

6. This incident arose because Plaintiff e-mailed attorney Carlos Nieves, who she had briefly dated and who was also a friend of Cruz, and told him that attorney Cruz had a document authored by him saved in her folder in GAC's server.

7. While at GAC, Plaintiff also had a conflict with attorney Gloriana Rodríguez ("Rodríguez"), another member of GAC's tax department, after she broke up with Rodríguez's brother, Juan Ramón. Plaintiff thinks that her private life became public because of attorney Rodríguez.

8. Bauzá presented Plaintiff with an offer to join them at a new law firm he was founding along with co-defendants Morell, Cartagena, Dapena, and attorney Gregory Usera. In fact, Plaintiff resigned to GAC because she received this offer from Bauzá.

9. The offer made by Bauzá entailed a higher compensation package than the one Plaintiff had at GAC.

10. Plaintiff began working at Usera, Morell, Bauzá, Dapena & Cartagena (hereinafter "UMBDC") on January 13, 2009 at the Hato Rey offices. UMBDC changed its name to Morell, Bauzá, Cartagena and Dapena (hereinafter "MBCD") on April 1, 2011.

11.   Bauzá was Plaintiff´s supervisor from the time he hired her to join
      UMBDC until her termination from MBCD.

12.   From January until August of 2009, Plaintiff was the only attorney from
      the Tax Department working at UMBDC´s Hato Rey offices.

13.   When she started at MBCD, her supervisor, Bauzá, who worked out of the
      Miramar office, visited the Hato Rey office a minimum of one time per
      day.

14.   The other members at MBCD´s tax department were attorneys Efraín
      Irizarry ("Irizarry") and Alexis Hernández ("Hernández"). Plaintiff was
      therefore at all times pertinent to this complaint the only female
      attorney in the Tax Department at MBCD.

*The Dusting-Off the Office Incident*

15.   On October 2009, co-defendant Lourdes Vázquez, the Firm's Administrator,
      was in charge of coordinating repairs to the offices. Specifically,
      Vázquez requested that the file cabinets (that were attached to the
      walls) be reinforced for security purposes. On October 26, 2009, when
      the repairs to [Plaintiff's] office were finished, Vázquez received a
      call from Plaintiff. Plaintiff was upset because her desk and some of
      her books had some dust that resulted from the repairs, and demanded
      that Vázquez send somebody to clean her office. Vázquez asked her if she
      could do it herself, like all other attorneys affected by the repairs
      had done.

16.   On that same date, Plaintiff sent an e-mail to Vázquez and the Firm's
      capital partners. She stated that she found it disrespectful that the
      administrator suggested to a partner at a law firm that she should clean
      her office. She added that she had not been hired for that purpose and
      that she did not bring cleaning supplies to the office. She then
      requested "the respect that she deserved."

17.   Attorney Cartagena concluded that Plaintiff used a harsh tone in her e-
      mail. He talked to Plaintiff about this issue. He also told Plaintiff
      that her e-mail did not make her look good.

18.   After Cartagena's conversation with Plaintiff, she went to his office.
      She told him that she did not know how to go about apologizing to
      Vázquez. Cartagena asked her if she wanted any help drafting an e-mail,
      and Plaintiff said yes.

19.   Plaintiff then sent an e-mail to the Firm's capital partners, with copy
      to Lourdes Vázquez, apologizing for her previous e-mail. She used the
      wording provided by Cartagena at her request.

*Plaintiff's Tardiness*

20.   Plaintiff participated in the Tax Department meetings.
21.   During those meetings, the members of the Tax Department discussed what
      the business hours for the department would be.
22.   Plaintiff was also notified by e-mail about the hours in which she was
      required to be present in the office.
23.   Despite being aware of these rules, Plaintiff believed they were all
      professionals that could decide at what time they would do whatever
      their responsibilities were.
24.   Plaintiff was generally the last attorney from the Tax Department to
      arrive in the morning.
25.   When she came in to the office in the mornings, everybody else from the
      Tax Department had already arrived.
26.   In fact, Plaintiff was the only one arriving after 9:00 a.m..
27.   On November 30, 2010, Bauzá sent an e-mail to all the members of the Tax
      Department in which he stated that all attorneys had to be at the office
      from 9:00a.m. to 6:00 p.m.. Plaintiff received said e-mail.
28.   The rule that attorneys notify when they were going to be absent or late
      was applicable to all employees and was notified by way of an e-mail
      sent by Gregory Usera to all employees on August 10, 2010.
29.   Plaintiff was late or absent from work without notifying her immediate
      supervisor by 9:00a.m. in several occasions, including (but not limited
      to) the following dates: September 7, 2010, November 10, 2010, January
      12, 2011, January 20, 2011, February 1, 2011, February 9, 2011, May 6,
      2011, and September 14, 2011.
30.   Plaintiff used her own judgment to decide when she would come in and out
      of the office.

*The Parking Lot Incidents*

31.   MBCD also had parking rules. If someone double parked or blocked a car,
      he/she had to leave the keys with the parking lot's security guard.
      Plaintiff received a document informing her of this rule.

32. On November 18, 2009, Plaintiff received an e-mail stating that if anyone did not leave the keys when double parked, they would have to park elsewhere. This e-mail was directed to all Firm employees.

33. If Plaintiff had come in earlier to work, she would not have had to block her co-workers.

34. Capital partners Bauzá, Cartagena and Dapena parked in this same parking lot, and followed the parking rules.

35. On November 2, 2010, the parking lot security guard, Mr. Joaquín Gonnel ("Gonnel"), approached attorney Dapena because Fontanillas did not leave the keys to her car despite the fact that she had blocked Liza Ruiz's vehicle. Ruiz had to leave from work early to take her daughter to a medical appointment. When Ruiz arrived to the parking lot, Plaintiff's vehicle was blocking hers. She had to call Plaintiff and wait until she came to the parking lot to move her vehicle.

36. Gonnel told attorney Dapena that Plaintiff would not be welcome to the parking lot the following day. The parking was owned and/or operated by Omega Engineering, S.E. or an affiliate of it, and Gonnel was an employee of the security company hired by the parking operator.

37. After speaking with Gonnel, attorney Dapena sent an e-mail to Lourdes Vázquez and Plaintiff. He informed them what Gonnel had told him, and asked Vázquez to accompany Plaintiff, on the following day, to speak to Gonnel and ask him for permission to park again in the lot. He also restated the general parking rule in his e-mail: whoever parks blocking another car has to leave the keys.

38. Plaintiff did not speak to Gonnel, but instead began parking in an adjacent lot. She was able to park there until June 13, 2011, when she was asked to leave. Plaintiff spoke to attorney Guillermo Silva and asked if he could intercede on her behalf with the building administrator so that she could remain parking there. Silva was unable to help and suggested that Plaintiff apologize to Gonnel.

39. After seven months, on June 13, 2011, Plaintiff was allowed back at the regular parking lot. Ten days after coming back, however, she once again blocked someone else's car without leaving the keys with the security guard as required by the rules.

40. On June 23, 2011, Plaintiff received an e-mail from co-defendant Vázquez, in which Vázquez required her to go down to the parking lot and either move her car or give the keys to the security guard. Plaintiff

disliked this e-mail because it required her to leave whatever she was doing to comply with what Vázquez asked in the e-mail. She found it disrespectful.

41. Plaintiff was also bothered by the fact that co-defendant Vázquez copied the Firm's capital partners in the e-mail. Because of this, Plaintiff replied to the e-mail and asked Vázquez to address her as "Attorney Fontanillas" from that point forward. She also wrote that she did not like the tone of the e-mail and demanded respect. Plaintiff copied the Firm's capital partners in her reply e-mail.

42. Co-defendant Edgardo Cartagena replied to Plaintiff's e-mail. He told her that she had to follow the rules and that if she blocked anyone, she had to leave the keys.

43. Attorney Cartagena also told Plaintiff that Vázquez was only doing her job at the capital partners' request. He further told her that if an exception was made for her, it then would have to be done for others.

44. Plaintiff again replied to attorney Cartagena's response. She wrote that if that was the case then e-mails should be sent to others that she understood were violating the rules. She also remarked that there was favoritism in the Firm.

45. Upon receiving this second e-mail, attorney Cartagena went to talk personally to Plaintiff. Fontanillas told him that she felt "documented" ("carpeteada") because the capital partners had been copied in Lourdes Vázquez's e-mail.

46. About an hour and a half later, Plaintiff sent attorney Cartagena yet another e-mail regarding the parking issue. She told him that she understood that others should not park in the adjacent parking lot and that everyone that was violating the rules (according to her) should receive an e-mail with copy to the capital partners. She did not identify who she was referring to.

*Plaintiff's Issues with the Female Attorneys at the Firm*

47. On October of 2010, Plaintiff went to Vázquez's office and told her that she was having issues with the "female attorneys from the litigation department." In particular, she mentioned that attorney Grisselle Bermúdez ("Bermúdez") was blind-copying attorney Bauzá in e-mails that Bermúdez had sent to her and to Bauzá's clients.

48. Plaintiff asked Vázquez not to bring these issues to the attention of the capital partners of the Firm.

49. During this meeting on October of 2010, Plaintiff did not mention having any issues or concerns regarding attorney Bauzá. In fact, Plaintiff is sure that, on this occasion, she only talked to co-defendant Vázquez about the "females of the litigation department."

50. Upon finishing the meeting with Plaintiff, Vázquez met with attorneys Briseida Delgado, Grisselle Bermúdez and Carmen Gloria Torrech to discuss the issues raised by Plaintiff. She listened to their side of the story, asked them to continue to maintain a cordial and courteous relationship with Plaintiff and to greet her whenever they saw her. Vázquez then spoke to attorney Dapena about the meetings.

51. Plaintiff also reminded Vázquez of an issue she had with her car, but did not bring up anything else during this meeting.

52. Upon learning about Plaintiff's complaint to Vázquez, Dapena undertook an internal investigation. He first met with Plaintiff on November 1, 2010. This meeting was held in her office, behind closed doors. No one else was present.

53. During this meeting, Plantiff told Dapena that she sometimes felt ignored and marginalized. She further complained that attorney Bermúdez's e-mails to Plaintiff were evasive.

54. During this meeting on November 1, 2010, Plaintiff also talked to co-defendant Dapena about the blind copies of e-mails sent by attorney Bermúdez to Bauzá. She also told Dapena that there were groups ("bandos") at the Firm, and that she was in one of the groups while the females of the litigation department were in another.

55. Plaintiff did not bring any personal "stuff or matters" to attorney Dapena's attention, and did not discuss anything else with him. In fact, Plaintiff did not mention having any issues with either attorney Bauzá or Efraín Irizarry. On the contrary, she said she would continue to have lunch with both of them as none of the females were inviting her.

56. Upon finishing this interview, Dapena asked Plaintiff how she wanted him to proceed with the information she had just given him. Plaintiff told him that she would consult it with her psychologist and let him know. On the following day, Plainitff asked Dapena to proceed with the investigation. Plaintiff provided copies of some of the e-mails sent by

    attorney Bermúdez that she felt proved her claims that Bermúdez was ignoring her.

57.  As requested by Plaintiff, attorney Dapena continued his investigation. He spoke to Gladys Fontanez, Efraín Irizarry, Alexis Hernández, Carmen Gloria Torrech, Grisselle Bermúdez and Briseida Delgado between November 2nd and November 5th, 2010.

58.  On November 5, 2010, upon finishing his interviews, Dapena prepared a memorandum addressed to MBCD's capital partners regarding Plaintiff's claims and summarizing his interviews. MBCD's capital partners discussed Plaintiff's claims during one of their meetings. Dapena then drafted a document to compile his findings.

59.  On November 17, 2010, Dapena met with attorney Fontanillas and Vázquez to discuss the Firm's findings. Dapena told Plaintiff that, upon reviewing the e-mails she provided and conducting the interviews, he had concluded that there were personal issues between her and the other female attorneys from the litigation department, but that they did not rise to level of any actionable claim. Dapena encouraged Plaintiff to try to maintain a cordial and respectful relationship with the female attorneys in the Firm and informed her that he and Vázquez had asked the other female attorneys to do the same.

60.  During this meeting, Plaintiff brought up the parking lot issue and questioned how it was possible that an employee decided whether or not she, a partner, could park in the lot. Dapena explained, again, that she had to follow the rules like everyone else and that Gonnel was not the Firm's employee, but rather an employee of the parking lot's owner. Plaintiff stated that her perception was that she needed to put in her resignation and look for another job. Dapena told her that such determination was very personal, and if she decided to leave she should discuss her decision with her supervisor, attorney Bauzá. During this meeting, however, Plaintiff did not provide any details to co-defendants Dapena or Vázquez of any circumstances that she felt were obligating her to put in her resignation, other than the issues previously mentioned.

61.  Dapena further told Plaintiff that he could not force the female attorneys from the litigation department to be her friends or get along with her. He also asked Plaintiff to maintain confidentiality regarding her complaint against attorneys Delgado, Bermúdez and Torrech. Finally,

Dapena asked her if there were any other issues she wanted to bring up or discuss.

62.  During this meeting on November 17, 2010, Fontanillas did not bring up any issues regarding attorneys Bauzá or Irizarry. By this time, however, Plaintiff had already received an e-mail from attorney Irizarry, in which he invited her to a dinner date.

63.  In fact, Plaintiff did not mention attorney Irizarry in any of the meetings she held with co-defendants Vázquez and Dapena (collectively or individually) in October and November of 2010.

64.  Plaintiff did not mention to Vázquez and Dapena during the meetings they held (individually or collectively) during October and November of 2010 that she felt discriminated against by attorney Bauzá.

65.  Attorney Grisselle Bermúdez had organized Plaintiff´s February 2010 birthday party at Piropos Restaurant. Plaintiff attended the party. Bermúdez had also planned Plaintiff's February 2009 birthday party, for which attorney Cartagena picked up the bill.

66.  Plaintiff visited the apartment owned by attorney Bermúdez and her parents in Fajardo for Bermúdez´s birthday.

67.  Attorney Bermúdez introduced Plaintiff to some of her friends.

68.  Before complaining about the female attorneys of the litigation department, Plaintiff went to a Wisin and Yandel concert with attorneys Bermúdez and Torrech.

69.  Before complaining about the female attorneys of the litigation department, Plaintiff had been invited by attorney Carmen Gloria Torrech to her apartment. Plaintiff accepted the invitation.

70.  Before complaining about the female attorneys of the litigation department, attorneys Torrech and Bermúdez invited Plaintiff to a trip to Punta Cana. Plaintiff was not interested.

71.  Plaintiff invited Vázquez to lunch constantly.

72.  Despite alleging she received the silent treatment after November 2010, Plaintiff invited her workers to lunch and the movies after that date.

73.  Plaintiff also received invitations to gatherings held after working hours from her coworkers.

74.  For her birthday in February 2011, Plaintiff received congratulatory e-mails from the Firm Administrator, staff, and fellow attorneys.

*Plaintiff's Communications with Co-Worker Attorney Irizarry*

75. Plaintiff received an e-mail from attorney Efraín Irizarry at 3:24 in the morning of October 21, 2010.

76. Plaintiff did not find the e-mail itself "kind of improper", but rather the time: 3:24 a.m..

77. Through this e-mail, Irizarry invited Plaintiff to dinner.

78. In the e-mail, Irizarry expressly stated that he would understand it if Plaintiff did not want to go. Irizarry also stated that he would abide by whatever she decided.

79. Plaintiff did not respond to this e-mail but rather decided to ignore it.

80. Plaintiff understood this e-mail to mean that Irizarry wanted to have a relationship with her.

81. Before receiving this e-mail on October 21, 2010, Plaintiff communicated with Irizarry through text messages and e-mail.

82. Plaintiff never told Irizarry that she was bothered by his text messages.

83. When Irizarry asked Plaintiff if he could call her, she replied with a "yes".

84. On May 4, 2010, Plaintiff sent a text message to Irizarry, at 10:41 p.m. to let him know she had arrived and that she would see him the following day.

85. Plaintiff told Irizarry that she was at Picadera (a restaurant) on May 28, 2010.

86. At 8:49 p.m. of October 8, 2010, Plaintiff sent a text message to Irizarry letting him know that she would be at La Concha in case he wanted to arrive. When she sent this text message to Irizarry, she was alone at La Concha, waiting for attorney Fontánez to arrive.

87. On October 16, 2010, Plaintiff asked Irizarry, by way of a text message, if there was a place for "hanging" [out] that night. She also confirmed she had not "pitched" [ignored] his calls.

88. Plaintiff also sent a text message to Irizarry in the early morning hours. For example, she once texted Irizarry at 1:32 a.m..

89. Even after receiving the e-mail on October 21, 2010, Plaintiff continued to communicate with Irizarry by way of e-mail. On October 29, 2010, she e-mailed him to thank him for copying her in an invitation to a party.

90.  Furthermore, on October 31, 2010 she replied to Irizarry via Facebook letting him know that she had indeed gone to the party.

91.  On December 16, 2010, while recovering at home from an operation, Plaintiff sent a text message to Irizarry to inquire about the Christmas bonus.

92.  Plaintiff first complained about sexual harassment by Efraín Irizarry on April of 2011, over five months after receiving the October 2010 e-mail from him. She brought this issue up during a lunch meeting she set up with attorney Bauzá.

93.  On April of 2011, upon receiving the sexual harassment complaint, Bauzá informed his partners, including attorney Dapena. He specifically told Dapena that during a lunch meeting he had with Plaintiff on April 1, 2011, she told him that she felt harassed by attorney Irizarry. Plaintiff also told Bauzá that attorney Irizarry had asked her whether she dreamt of co-workers and that Irizarry had sent her an e-mail on October 21, 2010 at 3:24 in the morning. Bauzá gave Dapena a copy of the e-mail Irizarry sent to Plaintiff.

94.  Dapena spoke to Plaintiff immediately after receiving this information from Bauzá. Plaintiff confirmed that there had been no other similar text messages or e-mails since that October 21st e-mail, but said there had been previous text messages and e-mails. Dapena asked Plaintiff to provide any other text messages, e-mails or evidence she had. She did not provide any at that time.

95.  After speaking with Plaintiff, Dapena interviewed attorney Irizarry, who admitted sending the e-mail on October 21, 2010 at 3:24 in the morning. He confirmed that Plaintiff never answered his e-mail, and informed Dapena that he had not sent any further e-mails or texts to her. Although Plaintiff never claimed any physical contact occurred between her and Irizarry, Dapena nonetheless inquired if any physical contact between them had occurred. Irizarry confirmed it had not.

96.  After concluding the interview, Dapena advised Irizarry to keep himself cordially distant from Fontanillas and not talk about the interview with her or any other Firm employee.

97.  After interviewing Plaintiff and Irizarry, Dapena concluded that there had been no illegal conduct by Irizarry. He then drafted a memorandum to his partners to inform them of the situation. Dapena discussed this with

the other partners of the Firm during one of their meetings. All partners agreed with Dapena's conclusion.

98.  After April of 2011, Plaintiff did not talk to anyone in the administration or any capital partner about this sexual harassment issue until September of 2011, when she forwarded text messages to Dapena. This was eleven months after receiving the e-mail from Irizarry and almost six months after bringing up the issue with Bauzá.

99.  When she joined UMBDC, Plaintiff received a copy of the firm´s sexual harassment policy.

100. Plaintiff does not know if Dapena met with other people to talk about her sexual harassment claim. She also does not know who Dapena spoke to when investigating her claims, what internal steps he took or if he met with his partners to discuss the situation.

101. On September 13, 2011, Dapena again met with Plaintiff. This time, Plaintiff went to Dapena's office to finally provide copies of the text messages and e-mails he had requested back in April. The text message exchange provided by attorney Fontanillas demonstrated that both Irizarry and Fontanillas used to exchange text messages, share information about each other.

102. During this meeting in September 2011, attorney Fontanillas stated that she would not resign.

103. After being terminated, Plaintiff alleged, for the first time, that Irizarry told her, while sitting in her office and moving his pelvic area, that he received nude pictures from Facebook. She also alleged (after being terminated) that Irizarry once told her he had a sexual dream with a coworker. During her deposition, Plaintiff confirmed that she had had no other incidents with attorney Irizarry.

104. Plaintiff never reported either of these two incidents to the Firm Administrator or to Dapena.

### *Plaintiff's Mother Inquires about the Christmas Bonus*

105. On December of 2010, while Plaintiff was recovering from surgery in her nose, she instructed her mother to call Bauzá to inquire about the Christmas bonus amount she had received. Bauzá in fact spoke to Plaintiff´s mother, and he was very kind ("amable") to explain how the bonuses had been awarded.

106. After inquiring about the bonus amounts, the information obtained by Plaintiff revealed that, except for 2 or 3, most of her co-workers received basically the same amount she received as a Christmas bonus.

107. Plaintiff does not know the criteria used by the Firm to determine the amount of Christmas bonus to be awarded to each attorney.

*The Medical Certificate*

108. On February 9, 2011, Vázquez received an e-mail from Plaintiff in which she indicated that she would be out of the office on said date because of medical reasons. The following day, on February 10, 2011, at 9:30 a.m., Plaintiff submitted to Vázquez a medical certificate from Dr. Gilberto Rodríguez. Such certificate stated that she was "released to return to work on February 11, 2011."

109. Despite having sent the medical certificate releasing her to return to work on February 11, Fontanillas claims to have come to work on February 10, 2011.

110. On that day, Vázquez first saw Plaintiff during a lunch outing in which MBCD employees were celebrating the birthday of one of its attorneys, Sarah Delgado.

111. Vázquez sent an e-mail to Plaintiff urging her to follow her doctor's orders and retire for the day. She also wished Plaintiff a speedy recovery.

112. Plaintiff found this e-mail to be improper.

*The Lasagna Incident*

113. On April of 2011, Plaintiff told attorney Carmen Gloria Torrech ("Torrech") after she failed to offer lasagna to Plaintiff: "We'll talk in court."

114. Specifically, while at the pantry area on that day, Torrech had offered lasagna she had brought from her home. Attorney Torrech did not offer lasagna to Plaintiff, but she did offer to attorney Marisara Figueroa, who chided Torrech for her late offering as the latter had previously offered lasagna to attorneys Pedro Giner and Diego Agueros by way of e-mail. Then, Plaintiff remarked as follows: "don't complain Marisara; at least you are being offered, unlike me, ignored all the time." Afterwards, a discussion ensued between Plaintiff and Torrech. Plaintiff ended the conversation by saying "don't worry, we'll talk in court."

115. Upon learning about the lasagna threat from attorney Torrech, Dapena investigated this incident as well. As part of this investigation, he again met with Plaintiff and all the persons present at the time this incident took place.

116. During this interview, Plaintiff also told Dapena that other female co-workers were ignoring her as well. She added Mrs. Liza Ruiz, Vázquez and attorney Gladys Fontánez to the group.

117. On this meeting held on April 20, 2011, Plaintiff did not bring up having any issues with Bauzá.

*The Alleged Discrimination*

118. Plaintiff felt discriminated by co-defendant Bauzá because he used to put his feet up on his desk and showed the soles of his shoes. She, however, does not know if this happened when he talked to other attorneys.

119. Plaintiff stated during her deposition that co-defendant Bauzá was reading a document leaning on his chair, he opened his legs displaying his crotch. At the time Plaintiff claims Bauzá displayed his crotch, his fly was not open and he was fully clothed. Plaintiff admits that she never mentioned this alleged behavior to anyone at the Firm.

120. Plaintiff did not include any allegations regarding co-defendant Bauzá leaning on his chair with his legs open and his crotch displayed in the EEOC charge she filed or in the complaint filed in the above-captioned claim. Plaintiff drafted both the EEOC charge and the complaint.

121. Plaintiff felt discriminated against by Bauzá because he would put his hand up to stop her from talking. She did not report this to the Firm Administrator or to Dapena.

122. Plaintiff does remember that, with a specific matter, Bauzá took away an assignment from attorney Irizarry and gave it to her.

123. Plaintiff never reported a pattern of Bauzá screaming at her or discriminating against her either to the Firm Administrator or to Dapena during their meetings.

124. Plaintiff claims she was discriminated against because attorney Bauzá disinvited her from meetings with clients. She recalls this happening twice.

125. Plaintiff does not know whether or not attorney Bauzá disinvited her male coworkers (Irizarry and Hernández) from meetings.

126. In 2009 and 2010, Plaintiff did not report feeling harassed or discriminated against by attorney Bauzá or attorney Irizarry.

127. While Plaintiff was employed by MBCD, Bauzá and attorney Gladys Fontánez worked closely together in some matters.

*Plaintiff's Assessment of the Other Co-defendants*

128. Plaintiff had no incidents with co-defendant Pedro Morell until her termination. In fact, he always was a perfect gentleman with her.

129. Plaintiff acknowledges that co-defendant Edgardo Cartagena was a perfect gentleman with her. Her only difference with him related to the e-mail exchange about the parking lot rules.

130. Plaintiff acknowledges that co-defendant Dapena was a perfect gentleman with her. Her only difference with him was during her termination meeting.

*The Performance*

131. Once, Bauzá reviewed income tax returns forms and screamed at Liza Ruiz and Plaintiff because they changed the returns after he had revised them.

132. Ruiz changed the return that had already been reviewed by Bauzá using the numbers Plaintiff had given her.

133. The return was filed with an error.

134. On or around the summer of 2009, Bauzá asked Plaintiff to handle a matter for a client at the Puerto Rico Industrial Development Corporation.

135. Attorney Bauzá was fully aware of the fact that Plaintiff would be visiting PRIDCO offices, along with attorney Esteban R. Bengoa, regarding this matter. He also knew that attorney Roxanna Cruz, with whom Plaintiff had had an incident while they both worked at GAC, was the Director at PRIDCO's Office of Tax and Legislative Affairs.

136. As part of this assignment, Plaintiff urgently needed to obtain a report and preapproval from the Office of Industrial Tax Exemption to close a transaction. This approval would have to be favorably recommended by attorney Cruz to PRIDCO Director Javier Vázquez ("Vázquez").

137. While at PRIDCO, Plaintiff met attorney Cruz incidentally. She asked about the status of the report she needed. Cruz told her that it was at the PRIDCO Director's office and that he was out that day and would be

out as well the following day. Cruz also mentioned that she needed to review it.

138. Despite having talked with Cruz, Plaintiff called the PRIDCO Director's secretary to inquire about the status of the document she needed from Cruz.

139. Sometime after speaking with Plaintiff, Cruz went to Vázquez's office. There, Vázquez's secretary told Cruz that Fontanillas had called the office inquiring about the status of the document.

140. Cruz understood that Fontanillas was questioning whether or not she would be doing her job. Cruz felt completely disrespected by Fontanillas' call to her supervisor's office.

141. Cruz had received an e-mail from Alexis Hernández, her personal friend, in which he had politely inquired about the case status. Cruz called him and let him know what Fontanillas had done. Cruz further told him how she felt about it and what had been the office personnel's reaction.

142. Cruz answered Hernández's e-mail and told him that she would do her job, as she always did, but stated that she deserved respect.

143. Cruz felt that Fontanillas portrayed her as a liar before her direct supervisor's support staff and disrespected the administrative personnel who, at the end of the day, were the ones that kept track of the documents that were ultimately signed (or not) by the Executive Director.

144. Cruz later received a call from Bauzá, who apologized for Fontanillas' conduct.

145. After this assignment, Bauzá determined that Plaintiff would no longer handle any issues involving PRIDCO.

146. On or around the end of 2010 and the beginning of 2011, Bauzá asked Plaintiff to find a way for an accounting firm that was closing its offices in Puerto Rico to maintain its license to provide auditing services in the Island without having to have its members reside in Puerto Rico.

147. Plaintiff researched the issue, and when she wrote the opinion for the client, she concluded that what the client wanted was not possible. She, in fact, understood that the client would not comply with the residency requirements if they closed the offices as they intended to.

148. After receiving Plaintiff's opinion, and seeing that it completely defeated the client's intention, Bauzá intervened. After Bauzá's

intervention, through which he proposed new factual possibilities, the client ultimately obtained the authorization it needed to maintain its license active despite closing its local offices.

149. The way in which Plaintiff handled this consultation led Bauzá to conclude that she was unable to think outside the box and propose creative ways to obtain client objectives. Instead, she just read and applied the law, in a very "black and white with no shades of grey" manner; perhaps effective at identifying legal obstacles but not so in ways to overcome them. Her excuse for not having come up with the solution herself is that she did not have all the relevant facts. Bauzá believes in good faith, however, that she could have asked the questions to elicit the necessary facts to make it work, just like he did.

150. From his perspective as a supervisor, and considering Plaintiff's years of experience, Bauzá thought that Plaintiff did what an associate or a less experienced attorney would have done: find the black letter law and leave it at that. That was not what he expected from a partner at the Firm.

151. On or around September 2010, Bauzá asked Plaintiff to work along with attorney Gladys Fontanez ("Fontanez"), from MBCD's corporate department, on some matters for another client. Bauzá asked them each to work on the specific areas of their specialty. Plaintiff, however, reviewed contracts which pertained to the corporate area, which was beyond her tax area of specialty.

152. The client contacted Fontanez directly and held a conference call with her. Plaintiff e-mailed the client directly to inquire when the conference call would be held, and the client informed her that it had already taken place.

153. Bauzá spoke to the client and apologized for Plaintiff's behavior. He found her conduct to be inappropriate.

154. Between late 2010 and early 2011, Bauzá asked Plaintiff to file a request with the Puerto Rico Treasury Department on behalf of a client that already had legal representation stateside. Instead of limiting the scope of her work to filing the document, she investigated the applicable federal statutes. Although the research was accurate, it had not been requested from her.

155. On or around May of 2011, Bauzá also asked Plainitff to find out which form had to be filed stateside to report a donation made by a

non-resident alien to a U.S. citizen. Plaintiff billed nine hours to find out this information. Bauzá had expected a partner with Plaintiff's years of experience and knowledge to find the answer quickly.

156. From his standpoint as a supervisor, Bauzá believed in good faith that Plaintiff over-researched the issues he assigned. This meant that Bauzá had to routinely write-off her time which could not be billed to the Firm's clients and in turn meant economic losses for the firm.

157. It was also Bauzá's good faith belief that Fontanillas put in danger the Firm's relationship with its clients. Bauzá thinks Plaintiff exercised poor judgment when dealing with them.

158. The Firm received a voice message from one of the clients whose work was assigned to Plaintiff. This client complained about the billing statement from the Firm. The client was further unhappy because the Internal Revenue Service was placing a new lien on their property despite having Plaintiff work on resolving the matter. Plaintiff heard this voice message.

159. The Firm was only able to collect the retainer fee that was asked of this client. They were not able to bill any of the work performed by Plaintiff on this matter.

160. Between the end of June of 2011 and the beginning of July of 2011, Bauzá summarized his experiences as Plaintiff's supervisor in a memorandum that he sent to his partners. He recommended that the Firm terminate Plaintiff's employment. Bauzá and his partners discussed this memorandum at length, as well as his recommendation, during the partners' meeting.

161. The capital partners of the Firm discussed Plaintiff's performance and the issues she was having with her female co-workers. They also received a memorandum from Bauzá in which he highlighted the performance issues that he understood Plaintiff was facing. Aside from including specific issues with different clients, Bauzá also expressed his concern regarding Plaintiff's failure to adhere to the Firm's rules. As his immediate supervisor, Bauzá's recommendation was that Plaintiff be terminated.

162. By mid-August of 2011, the capital partners of the Firm discussed Bauzá's memorandum. After carefully considering what Bauzá considered were Plaintiff's performance and behavior issues, they decided to terminate her employment. Before going on with the termination, however, they consulted the decision with outside labor and employment counsel.

163. Attorney Dapena drafted a memorandum to read to Plaintiff during the termination and exit meeting.

164. On September 28, 2011, attorneys Bauzá and Dapena met with Plaintiff to inform her about the capital partners' decision to terminate her employment. Dapena read the document he had drafted to Plaintiff, who requested a copy of it. Dapena provided the copy.

*The Epilogue: Current Circumstances*

165. Two months after being terminated, in December 3, 2011, Plaintiff drove from Ponce to Bayamón to attend a gathering at a friend's apartment to watch the Cotto-Margarito fight.

166. Plaintiff was hired by McConnell-Valdes (hereinafter "McV") on March 13, 2012, five months after her termination.

167. When hired at McV, Plantiff was offered a compensation package of $120,600.00.

168. Since joining this firm [McV], and after her first evaluation, Plaintiff's base salary was increased by three thousand dollars. Her expense accounts remained the same.

169. Plaintiff has a very good relationship with her current co-workers at McV.

170. Plaintiff´s billable hours at McV are at the top.

171. Plaintiff filed a complaint with the Equal Employment Opportunity Commission on November 7, 2011. This document consists of fifteen typewritten pages. Plaintiff did not mention that Bauzá sat in a way in which she could discern his crotch. She also did not mention that Bauzá showed her the soles of his shoes, or that he raised his hand making a "stop" gesture when she tried to speak.

### III. DISCUSSION

Plaintiff claims the Defendants discriminated against her and terminated her employment in violation of Title VII and local laws because of her gender. Plaintiff also asserts that she was the victim of retaliation for opposing the Defendants' unlawful employment practices in violation of Title VII and various local laws.

**A. Title VII Claims**

   **1. Sex-Based Differential Treatment**

Title VII, which prohibits discrimination because of sex, provides "that '[i]t shall be an unlawful employment practice for an employer … to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)). "The core inquiry in a gender-based disparate treatment case is whether the defendant intentionally discriminated against the plaintiff because of her gender." Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir.2010) (citing Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir.2004)). "[T]o successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer.'" Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 144 (1st Cir.2012) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir.2003)). Adapted to the instant case, the plaintiff must set forth proof "that males were similarly situated and that she was treated differently, … and then that gender was the reason for that difference … ." Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir.2002) (internal citation omitted); see also Trans World Airlines v. Hardison, 432 U.S. 63, 71, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) ("[S]imilarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin.").

A plaintiff is not required to adduce direct proof of discrimination and may instead take advantage of the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to raise an inference of disparate treatment. See Ahern, 629 F.3d at 54 (internal citations omitted). In order to establish a prima facie case under Title VII, a plaintiff must show that: "(1) she is a member of a protected class; (2) her employer took an adverse employment action against her; (3) she was otherwise qualified; and (4) her position remained open or was filled by a person with qualifications similar to hers." Johnson v. University of Puerto Rico, 714 F.3d 48, 53 n. 6 (1st Cir.2013) (citing García v. Bristol–Myers Squibb Co., 535 F.3d 23, 30 n. 2 (1st Cir.2008); Rodriguez–Cuervos v. Wal–Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir.1999)). "If the plaintiff establishes this prima facie case, the burden of production — but not the burden of persuasion — shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action." Lockridge v. The University Of Maine System, 597 F.3d 464, 470 (1st Cir.2010). "If the employer provides such a reason, the plaintiff has to show by a preponderance of the evidence that

the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Johnson, 714 F.3d at 54 (citations omitted).

In her complaint, the Plaintiff raises a claim of disparate treatment to the extent her former employer MBCD and the individual defendants engaged in a pro-male pattern of work assignment. See Docket No. 1. In summary, the allegations related to her claim of disparate treatment are that attorney Alexis Hernández, a co-worker at MBCD's Tax Department, failed to give her credit for her tax expertise in a meeting with other MBCD attorneys, belittled Plaintiff's involvement in some work during a meeting with partners and suggested several changes be made to her work. See Docket No. 1. Plaintiff also complained Hernández acted as if he were her boss. Id. Fontanillas also alleged that the male attorneys in the office promoted each other instead of Plaintiff with the other departments at MBCD when it came to matters of taxation, her area of expertise. She also claimed that MBCD was like a "boys club" where men-only meetings were held and she was expressly excluded. Id. With regards to co-defendant Bauzá, the Plaintiff alleged that he left for meetings without her and disinvited her from meetings and conference calls with clients; used her research so that another male member of the Firm write the position letters; assigned work to Hernández instead of her; removed her from projects she had worked on and minimized contact between her and clients. Id.

In their motion for summary judgment, the Defendants state that "[a]lthough Plaintiff makes a general claim of gender discrimination, she sets out no facts that could give rise to a claim of disparate treatment." Docket No. 63 at page 30 n. 35. According to Defendants, Fontanillas has no evidence that Bauzá treated her and her male peers in a disparate fashion, or that he acted the way he did because of her gender. See Docket No. 63 at page 24. The court notes that the Plaintiff in fact makes no reference to her disparate treatment claim in her opposition memorandum and she completely abandoned all allegations related to the conduct of her co-worker Hernández.

At any rate, assuming the Plaintiff is able to make out a prime facie case of discrimination, see Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir.1996) ("On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext

and discriminatory animus."), the court finds that the Defendants have properly articulated a legitimate, non-discriminatory reason for the adverse employment actions the Plaintiff alleged. The Defendants set forth proof evincing that the Plaintiff was terminated because of her performance deficiencies, her failure to adhere to the Firm's rules and her poor personal relationships with her co-workers at MBCD.[2] See Factual Findings No. 131-162.

At this final stage then, the inference of discrimination disappears. The Plaintiff is thus required to show that the Defendants' explanations are a pretext and that a motivating factor for the unequal terms and conditions of her employment and her termination was her gender. "[I]n disparate treatment cases, comparative evidence is to be treated as part of the pretext analysis … ." Kosereis v. Rhode Island, 331 F.3d 207 (1st Cir.2003) (citing Conward v. Cambridge School Committee, 171 F.3d 12, 19 (1st Cir.1999)). The court will thus address the merits of her disparate treatment claim in light of the factual findings set forth *supra*.

The first instance *on record* in which it stems that the Plaintiff complained of differential treatment was when Lourdes Vázquez sent Plaintiff an e-mail on June 23, 2011 copying all capital partners at MBCD. In this e-mail, Vázquez asked Fontanillas to move her car or give the car keys to the parking lot's security guard, Mr. Gonnel, as per the parking lot rules, because she had not. Fontanillas responded to all recipients in disgust of Vázquez's message and an MBCD partner replied ordering her to follow the parking lot rules. The Plaintiff then sur-replied stating that similar reprimands should be given to others that she understood were violating rules and complained that there was favoritism at MBCD. See Factual Finding No. 44. Despite making this generalized complaint in this e-mail, however, the Plaintiff has set forth no proof showing that her male counterparts received less stringent sanctions for similar conduct or for failure to abide by rules. In addition, it is a fact on record that on November 17, 2010, seven months before this incident, attorney Dapena had met with Fontanillas and told her

---

[2] Fontanillas' poor interpersonal relationships with her co-workers, or lack thereof, and her failure to adhere to rules with regards to the parking lot and her tardiness, *inter alia*, are well documented; her performance shortcomings are less so and are only evinced by her supervisor Bauzá's review and perception of her work, with which the Plaintiff disagrees. Notwithstanding, the court is mindful that its role is not to "second-guess the business decisions of an employer, nor to impose [its] subjective judgments of which person would best fulfill the responsibilities of a certain job." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir.1990). "Courts may not sit as super personnel departments, assessing the merits -or even the rationality- of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir.1991).

[verbally] that she had to follow the parking lot rules like everyone else, and explained to her that Mr. Gonnel was not the Firm's employee, but rather an employee of the parking lot's owner. See Factual Finding No. 59-60. Therefore, the Plaintiff was fully aware of the rule in question and of her deviation therefrom by not leaving the car keys with Mr. Gonnel as it had previously been a matter of discussion between the partners at MBDC and the Plaintiff. What is more, she had been previously thrown out of the parking lot for violating this very rule. See Factual Finding No. 36. Additionally, there is no evidence that the reprimand she received was based on her gender as opposed to, once again, not leaving her car keys with the security guard.

Now, with regards to co-defendant Bauzá, her immediate supervisor, the Plaintiff complained during her deposition that she felt discriminated by him because: he used to put his feet up on his desk thereby showing the soles of his shoes; he would put his hand up to stop her from talking; and, he disinvited her from meetings with clients twice in a span of two and a half years of employment.[3] See Factual Fidnings No. 118, 121, 124. In her complaint and her opposition, the Plaintiff also claims that Bauzá yelled at her, although its frequency is uncertain because the Plaintiff has failed to place the court in a position to judge its severity. Nevertheless, Plaintiff admittedly does not know if any of this happened when Bauzá talked to or addressed the other attorneys or whether or not attorney Bauzá disinvited her male co-workers (Irizarry and Hernández) from meetings. See Factual Findings No. 118, 125. In fact, the Plaintiff never reported a pattern of co-defendant Bauzá screaming at her to the Firm Administrator or to co-defendant Dapena during their many meetings.[4] See Factual Findings No. 123. As a result, there is no comparative evidence before the court as to whether or not Bauzá treated similarly-situated male employees more favorably.

---

[3] According to the Plaintiff's allegations in the complaint, one of the instances in which co-defendant Bauzá disinvited her from a meeting with a client took place on August 24, 2011. See Docket No. 92 at ¶ 92. Even if the court were to take this allegation as true at this stage of the proceedings, the court is now aware that by this date, Bauzá had already recommended that the Plaintiff be terminated for the reasons Defendants have set forth herein. See Factual Finding No. 162.

[4] Among her allegations of gender-based discrimination, the Plaintiff also claimed in her complaint that Bauzá "avoided communicating in person with Plaintiff, leaving his written comments to the documents Fontanillas had drafted with the legal assistant or on her chair when she was momentarily away from her office." See Docket No. 1 at ¶ 115. The court finds that the Plaintiff's complaints towards attorney Bauzá present a type of "damned if you do, damned if you don't" scenario, where if Bauzá talked to her, she complained about the way in which he did, and if he did not talk to her, she complained of being the victim of the "silent treatment," see Docket No. 1 at ¶ 116.

Additionally, despite alleging in her complaint that Bauzá reassigned tasks to her male co-worker (Hernández) that were originally assigned to her, see Docket No. 1 at ¶ 44, 70-71, she also complains that Bauzá assigned her work to Liza Ruiz, a female. See Docket No. 1 ¶ 91. So, in essence, as per Plaintiff's own allegations, Bauzá reassigned work to both her male and female co-workers. What is more, the Plaintiff admitted in her deposition that at one point, Bauzá took away an assignment from attorney Irizarry, a male, and gave it to her, a female. See Factual Finding No. 122. This allegation is thus meritless.

The only other instance on record where Bauzá removed her from a project and/or minimized contact between her and a client was when he decided that Plaintiff would no longer handle any matters involving PRIDCO. See Factual Finding No. 145. The justification behind such a determination, as explained by the Defendants, was that on or around the summer of 2009, Fontanillas attended a meeting at PRIDCO where she met attorney Roxanna Cruz, with whom Plaintiff had had a confrontation of some sort while they both worked at GAC. At the time of this meeting, attorney Cruz was the Director at PRIDCO's Office of Tax and Legislative Affairs. See Factual Finding No. 145. The events that transpired during and shortly after the meeting in question resulted in attorney Cruz perceiving that the Plaintiff had disrespected her, see Factual Finding No. 140, and Bauzá ended up having to call Cruz to apologize for the Plaintiff's conduct, see Factual Finding No. 144. In fact, in her opposition, the Plaintiff admits that her situation at worked changed, in part, because she "did not 'play nice' with Roxana [sic] Cruz," see Docket No. 75 at page 74. Therefore, Fontanillas was admittedly not removed from assignments involving PRIDCO because she was a woman, but because of her behavior towards a PRIDCO officer, namely, Roxanna Cruz.

In her complaint, the Plaintiff alleged that on February 9, 2011, Bauzá reprimanded her for arriving to work at 9:40a.m., and therefore, late. See Docket No. 1 at ¶ 55. Once again, no comparative evidence exists as to whether the male attorneys were not reprimanded for being late. At any rate, even if she was censured for being late, it is a fact on record that on November 30, 2010, over two months prior to the alleged reprimand, Bauzá notified all attorneys in the Tax Department via e-mail that they had to be in the office from 9:00a.m. to 6:00p.m.. See Factual Finding No. 27. Notwithstanding, the Plaintiff even admits deviating from this rule. According to her, "[she] often worked until late hours in the night and would, therefore, come in later the

following morning." <u>See</u> Docket No. 75 at page 11. Her excuses, however, are unavailing. The Defendants have set forth a clear-cut rule of the workplace that applied to all attorneys in her department, male <u>and</u> female, that the Plaintiff admits violating based on her own judgment, <u>see</u> Factual Finding No. 30, and thus, the Plaintiff has failed to show that any adverse employment action taken against her for her tardiness was motivated by her gender.

Plaintiff also alleged in her complaint that the Christmas bonuses paid to the other male tax attorneys were higher than the amount paid to Plaintiff for the years 2010 and 2011. <u>See</u> Docket No. 1 ¶ 108. Notwithstanding, in her deposition, the Plaintiff admitted that on December of 2010, after inquiring about the bonus amounts, she obtained information that revealed that, except for a couple, most of her co-workers received basically the same amount she received as a Christmas Bonus. <u>See</u> Factual Finding 105-106. The court notes, however, that Plaintiff was no longer an employee in December of 2011, and had not been since September of 2011. At any rate, the Plaintiff failed to provide any comparative data with regards to the amounts MBCD awarded as Christmas bonuses in December of 2011. Therefore, this allegation is also meritless.

Having addressed the Plaintiff's complaints with regards to the workplace while at MBCD, the court notes that "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 80 (1998) (citations omitted). Here, Fontanillas has not "even produced a scintilla of probative evidence, either direct or circumstantial, of disparate treatment between male and female [employees]," <u>Ayala-Gonzalez v. Toledo-Davila</u>, 899 F.Supp.2d 139, 141 (D.P.R. 2012), and has thus failed to carry her burden. On the contrary, in her opposition, she admittedly attributes Bauzá's change in attitude towards her two events that have nothing to do with her gender: (1) the incident at PRIDCO with attorney Roxanna Cruz, and (2) the incident in which Bauzá reprimanded her and her co-worker Liza Ruiz for making changes to a tax form that he had already reviewed and approved. <u>See</u> Docket No. 75 at pages 7-8, 10.

Not only has Fontanillas failed to show that her male co-workers were similarly situated and that she was treated differently, but"[t]here is also no evidence that the decision makers were motivated by gender discrimination. The mere fact that the decision makers were male does not alone, absent other evidence, create an inference that they engaged in gender discrimination."

Rivas Rosado, 312 F.3d at 534. In fact, the record shows that, although co-defendant Bauzá recommended she be fired from MBCD, he had in 2004 hired the Plaintiff to work at GAC and recommended her for promotion to basic partner in 2008 as the Chair for the Tax Department at GAC. See Factual Findings No. 1-3. Moreover, shortly after her promotion, he extended her an offer to join him in his new firm after he left GAC, and succeeded in recruiting her with a better compensation package than the one she was earning. See Factual Finding No. 8. As far as the court knows, the Plaintiff was always a woman between 2004 and 2009, when she was hired, promoted and recruited by Bauzá. The First Circuit has recognized that a strong inference of nondiscrimination exists where, as here, the hirer and firer are the same person. See Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 512 (1st Cir.1996) (citing Tyndall v. National Educ. Centers, Inc. of California, 31 F.3d 209, 214 (4th Cir.1994)).

Beyond the mere fact that Fontanillas is a woman and Bauzá is a man, there were no statements or behaviors by the males involved in terminating Plaintiff from which an inference of discrimination could be drawn. "[T]here is no evidence that any difference in how she was treated was based on gender, and ample evidence of legitimate reasons for her differential treatment." Alvarado-Santos v. Department Of Health Of The Commonwealth Of Puerto Rico, 619 F.3d 126, 134 (1st Cir.2010). Consequently, the court **GRANTS** the Defendants' motion for summary judgment with respect to the Plaintiff's claims of sex-based disparate treatment under Title VII.

### 2. Sexual Harassment

"[S]exual harassment is a form of sex discrimination, the Supreme Court tells us — by committing or tolerating sexual harassment against an employee, an employer has effectively altered the terms or conditions of the victim's job." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 136 (1st Cir.2013) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). "There are various types of actionable sexual harassment claims under Title VII: hostile work environment claims, *quid pro quo* harassment claims and retaliation claims." Perez v. Developers Diversified Realty Corp., 904 F.Supp.2d 156, 163 (D.P.R. 2012) (citing Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir.2006)).

In the case at hand, the Plaintiff complains of a hostile work environment in the workplace. In their motion for summary judgment, the Defendants contend that the Plaintiff fails to establish all elements of the prima facie case, except for the first, to wit, that she is a member of a

protected class. See Docket No. 63 at page 14. After careful review of the allegations and the factual findings, the court finds that the Plaintiff's claim of hostile work environment is three-fold because it's based on: (1) Irizarry's comments and messages; (2) Bauzá's alleged conduct; and, (3) her co-workers' behavior towards her. Each shall be analyzed in turn.

### a. Hostile Work Environment

We begin our analysis with the hostile work environment framework in the context of a sexual harassment claim under Title VII. The key elements of a hostile-work-environment claim are as follows:

> (1) the plaintiff belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create a discriminatorily-abusive work environment; (5) the complained-of conduct was both objectively and subjectively offensive; and (6) there is a basis for employer liability.

Medina-Rivera, 713 F.3d at 137 n. 2.

In their motion for summary judgment, the Defendants argue that Irizarry and Bauzá's conduct was not severe or pervasive enough to create a hostile work environment.

Her most obvious claims of sexual harassments stem from her relationship with fellow attorney and co-worker, Mr. Irizarry. It stems from the record that on October 21, 2010 at 3:24a.m. she received an e-mail from him inviting her out to dinner. Fontanillas admits that, for the most part, the time in which the e-mail was sent, as opposed to the content, made her think it was improper. See Factual Finding No. 75-76. Plaintiff never complained to Irizarry himself about how uncomfortable this message made her feel, and in fact, continued to occasionally communicate with him thereafter via e-mail, Facebook or text. See Factual Findings No. 89-91. Notwithstanding, six months after Irizarry sent this e-mail, the Plaintiff complained about it to Bauzá during a meeting on April 1, 2011, and also told him that Irizarry had made a comment regarding a sexual dream with a co-worker. Then, after her termination, Fontanillas also complained for the first time to her employer that Irizarry had made a comment about receiving nude pictures in Facebook, all this while moving his pelvic area. So in total, the Plaintiff alleged three incidents of what she perceived was sexual harassment on the part of Irizarry, of which only two she complained about during her employment.

"Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment … ." 29 C.F.R. § 1604.11 (2010). "One type of sexual harassment … involves 'bothersome attentions or sexual remarks' so 'severe or pervasive' that they create a 'hostile work environment.'" Medina-Rivera, 713 F.3d at 136 (internal citations omitted).  Assuming that Irizarry's conduct satisfies the first three elements of the applicable test, the court must determine whether or not the harassing treatment meets the "severe or pervasive" standard. To that effect, the First Circuit Court of Appeals has held that a court must consider several relevant factors including "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir.2013). Notwithstanding, "a single act of harassment may, if egregious enough, suffice to evince a hostile work environment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir.2005).

The events chronicled by the Plaintiff fail to evince that "her contact with [Irizarry]… was egregious, or so egregious as to evince a hostile work environment. … On the scale of what has been recognized as egregious conduct rising to the required level, this was not close." Ponte v. Steelcase Inc., --- F.3d ----, No. 13-2011, 2014 WL 341166 at *8 (1st Cir. January 31, 2014) (citations omitted). In fact, with regards to Irizarry's comments or messages, the Plaintiff states in her opposition that she "felt uncomfortable and reacted by ignoring Irizarry and his propositions." Docket No. 75 at page 9. However, "discomfort is not the test." Ponte, 2014 WL 341166 at *7 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (noting that Title VII was not intended to be a "general civility code" for the workplace)). In addition, Irizarry's conduct could not even have been subjectively offensive if she was able to ignore it. See Cordero-Suarez v. Rodriguez, 689 F.3d 77, 83 (1st Cir.2012) (finding that the alleged instances in which supervisor harassed and threatened plaintiff-employee, which she admittedly ignored without consequence, fall short of the type of conduct the court has found "severe and pervasive" in the past).

The same is the case with some of the allegations of sexual harassment attributed to co-defendant Bauzá. Plaintiff, in an attempt to bolster her claim of sexual harassment, asserted during her deposition for the first time in these proceedings that Bauzá was reading a document leaning on his chair and opened his legs, thereby displaying his crotch. Notwithstanding, Plaintiff

admits that his pants' zipper was closed and he was fully clothed at all relevant times. Fontanillas also acknowledges that she never mentioned this alleged behavior to anyone at the Firm or included any allegations of sexual harassment regarding co-defendant Bauzá in the EEOC charge she filed or in the complaint. See Factual Findings No. 119-120. But while the court speculates that Plaintiff may have felt uncomfortable while sitting in front of Bauzá, once again, "discomfort is not the test," Ponte, 2014 WL 341166 at *7, and her allegations as to the way Bauzá simply sat in his chair could not have either altered the conditions of her employment or created a discriminatorily-abusive work environment.

The court will now move on to discuss a different set of allegations pertaining to her hostile work environment claim, which relate to the way Bauzá treated her as her supervisor and her relationships, or lack thereof, with her co-workers, including co-defendant Vázquez.

A Title VII hostile work environment claim also exists where a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. See Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 228 (1st Cir.2007) (internal citations and quotations omitted).

> [A]ctions of informal harassment, as opposed to formal employment actions like transfers or demotions, amounting to a hostile work environment can rise to the level of a challengeable employment action, … but only if the discriminatory acts are sufficiently severe … .

Cordero-Suarez, 689 F.3d at 82 (internal citations and quotation marks omitted).

As to Bauzá, the Plaintiff also complains that he screamed at her. The factual record before the court shows that the only instance in which he did was when he yelled at Fontanillas and Liza Ruiz after discovering some income tax return forms were filed with an error and they both had made changes to these forms after he had revised and approved them. See Factual Findings No. 131-133. However, in her complaint she describes two more incidents in which he did: (1) on November 17, 2010, in reference to an e-mail she sent a client, see Docket No. 1 at ¶ 46; (2) on June 30, 2011, during the course of

a telephone call with regards to the filing of a closing agreement, id. at ¶ 80. The Plaintiff also complained that he used to put his feet up on his desk showing the soles of his shoes and put his hand up to stop her from talking, yet she never reported any of this to the Firm Administrator or to co-defendant Dapena. See Factual Findings No. 121-123. In her complaint, Plaintiff also recounts that Bauzá opened her office's locked door while she was away from her office, took some books and then questioned whether the books belonged to her, see Docket No. 1 at ¶¶ 49-52; that on February 9, 2011 and June 27, 2011, respectively, he sent her an e-mail reprimanding her for violating the Firm's rules by being late or absent without notification, id. at ¶¶ 55, 77; that on March 28, 2011, Bauzá ordered her to help their legal assistant bind some documents for a seminar, id. at ¶¶ 56-62; that on July 7, 2011, Bauzá mockingly asked her if she wasn't a partner with an L.L.M., id. at ¶ 81.

Even construing these events in the light most favorable to the Plaintiff, the court finds that none of them qualifies as an act of sexual harassment under Title VII. The Plaintiff simply fails to establish that the harassment that she claims created a hostile work environment was based on her sex. See Medina-Rivera, 713 F.3d at 137 n. 2; Forrest, 511 F.3d at 228. In fact, the instances in which she alleges that Bauzá yelled at her were all prompted by some sort of work-related disagreement, not her sex. Therefore, they have not even been traced to any discriminatory animus. And although Bauzá's conduct may have at times been arguably unpleasant or brusque or uncivil, "we note that 'a supervisor's unprofessional managerial approach and accompanying efforts to assert [his] authority are not the focus of the discrimination laws.'" Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 44 (1st Cir.2011) (quoting Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 46-47 (1st Cir.2003)) (holding appellant could not show hostile or abusive work environment where supervisor regularly refused to meet with appellant, yelled at her in front of co-workers, failed to act to prevent or deter other employees from making derogatory comments regarding appellant, and limited appellant's movements around workplace, inter alia). Moreover, "the evidence does not support a hostile work environment claim. The incidents described are episodic, but not frequent, in nature; upsetting, but not severe; mildly humiliating, but not physically threatening." Colon-Fontanez, 660 F.3d at 44-45.

Moving on to the claims against her co-workers, in particular, her *female* ones, Fontanillas points out the following incidents as indicative of a hostile work environment: (1) that Lourdes Vázquez told her to clean her office herself after the Plaintiff complained to her of dust in her office following some repairs; (2) that Vázquez sent her an e-mail copying the capital partners at MBCD ordering her to give her car keys to the parking lot's security guard because Fontanillas had thereby violated parking lot rules; (3) that on February 10, 2011, Vázquez sent her an e-mail asking her to leave during a lunch outing with coworkers because according to a medical certificate Fontanilla had turned in to justify her absence, the latter was supposed to be resting until the next day;[5] (4) that the female attorneys at MBCD, Liza Ruiz and co-defendant Vázquez ignored her, making her feel marginalized; (5) that fellow attorney Grisselle Bermúdez blind-copied Bauzá in some e-mails; (6) that Torrech failed to offer Plaintiff a piece of her lasagna during lunch and a discussion ensued. However, despite these incidents, the Plaintiff admits inviting Vázquez to lunch constantly and even inviting her coworkers to movies or lunch after complaining of being the victim of the "silent treatment" on their part. See Factual Findings No. 71-72.

While these facts certainly indicate an uncomfortable and tense working relationship between Plaintiff and her female colleagues, again, "they are not sufficiently severe or pervasive to constitute a hostile work environment." Colon-Fontanez, 660 F.3d at 44. In fact, they are not even based on her sex, but more likely, on the type of person she was. "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins … to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir.2000). "Not fitting into the clique hardly arises to the intentional discrimination that is prohibited by Title VII, which 'is not a code of civility.'" Wilson v. Kautex, Inc., No. 1:07-CV-60-TS, 2009 WL 1657463 at *34 (N.D.Ind. June 10, 2009) (quoting Yuknis v. First Student, Inc., 481 F.3d 552, 556 (7th Cir.2007)).

---

[5] The court notes that the record reflects that the Plaintiff alleges to have been reprimanded by Bauzá for her tardiness on February 9, 2011, day on which she later leaves for "medical reasons" and turns in a medical certificate releasing her to return to work two days later on February 11th, see Factual Finding No. 108. Yet, on the following day, Fontanillas is well and able to attend a birthday lunch with her co-workers, see Factual Finding No. 110.

Alternatively, under Title VII, when "the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State University, 133 S.Ct. 2434, 2439 (2013). "Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." Noviello, 398 F.3d at 95.

The evidence on record at this stage reflects that when the Plaintiff complained about her female co-workers attitude towards her, as well as Irizarry's alleged sexual harassment, the Defendants undertook an investigation of her complaints, interviewed all involved, and after reaching their conclusions, encouraged the female attorneys to maintain a cordial relationship with Fontanillas, see Factual Finding No. 60, and instructed Irizarry to keep his distance from Plaintiff, see Factual Finding No. 96. Therefore, the court finds that MBCD and the Plaintiff's supervisors took prompt remedial action with regards to the two instances of harassment and hostile work environment that the Plaintiff brought to her employer's attention, and thus, no negligence can be attributed to the Plaintiff's former employer on account of her co-worker's actions.

As per the foregoing, the Defendants' request that the Plaintiff's hostile work environment claim under Title VII be dismissed is hereby **GRANTED.**

### 3. Retaliation

In her complaint, the Plaintiff alleged that she was terminated in retaliation for protesting about sexual harassment and a hostile work environment. See Docket No. 1 at ¶ 141.

Title VII makes it unlawful for an employer to retaliate against a person who complains about discriminatory employment practices. See 42 U.S.C. § 2000e-3(a). Title VII's anti-retaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In Univ. of Texas Sw. Med. Ctr. v. Nassar, ---U.S. ----, 133 S.Ct. 2517 (2013), the Supreme Court recently held as to Title VII retaliation claims that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a **but-for** cause of the

alleged adverse action by the employer." Id. at 2534 (emphasis ours). Therefore, "[i]t rejected the less stringent standard that the plaintiff must show only that retaliation was a 'motivating' factor." Ponte, 2014 WL 341166 at *9.

     "Retaliatory termination claims based on circumstantial evidence are evaluated using the *McDonnell Douglas* burden-shifting framework." Id. (citations omitted). To succeed on a retaliation claim, a plaintiff must first prove these elements: (1) that she undertook protected conduct; (2) that her employer took a material adverse action against her; and, (3) that a causal nexus exists between elements one and two. See Medina-Rivera, 713 F.3d at 139 (internal citations omitted).

     There is no question that Fontanillas was discharged on September 28, 2011, and thus suffered an adverse employment action. We shall thus address the other requirements in turn.

     In their motion for summary judgment, the Defendants contend that the Plaintiff does not meet the first prong of the applicable test. See Docket No. 63 at page 31. In essence, the Defendants' position is that these complaints do not amount to "protected activity" as required by Title VII because she could not have reasonably believed in good faith that she was opposing an unlawful practice that had taken place six months prior to her internal complaint, especially when the alleged sexual harassment had ceased. See id.

     "[P]rotected conduct under Title VII's anti-retaliation provision is not limited to filing an administrative charge of discrimination. It expressly prohibits retaliation for 'oppos[ing] any practice made an unlawful practice' by Title VII." Petrarca v. Southern Union Co., No. 04-310S, 2007 WL 547690 at *12 (D.R.I. 2007) (citing 42 U.S.C. § 2000e-3(a)). See also Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 31 (1st Cir.2011) (finding plaintiff's reporting of complaints to his superiors about the harassment to which he was subjected suffice to show his "opposition" to that harassment, within the meaning of Title VII); Matima v. Celli, 228 F.3d 68, 78-79 (2d Cir.2000) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, 'including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'"). In accordance with the applicable caselaw, the court finds that

the Plaintiff's complaint to Bauzá regarding what she perceived was Irizarry's sexual harassment is sufficient to meet the protected conduct element of her Title VII retaliation claim.

The Defendants alternatively argue that Fontanillas does not make out a prima facie case of retaliation under Title VII on the grounds that her termination in September of 2011 is not causally linked to her complaint of sexual harassment. According to the Defendants, the Plaintiff fails to meet the newly-set "but-for" causation standard set forth in Nassar. See Docket No. 63 at pages 32-33. With regards to this argument, the court is forced to set forth that "it is not entirely clear where the analysis of causation fits into the McDonnell Douglas framework as applied to Title VII retaliation claims," Hubbard v. Tyco Integrated Cable Systems, Inc., No. 10-cv-365-LM, 2013 WL 6234623 at *23 (D.N.H. December 03, 2013), either when considering the third element of the prima facie case or at the final stage of the framework as a part of a plaintiff's ultimate burden, see id.. In fact, in Ponte, the First Circuit Court of Appeals avoided the question by engaging into a "larger picture" analysis when reaching this stage of the discussion of the prima facie case. See Ponte, 2014 WL 341166 at *9 (rejecting plaintiff's contention that chronological proximity supported inference of causation at prima facie stage because "larger picture" undermined his claim). Because of this uncertainty, the court shall be particularly mindful that it has been consistently held that "[m]eeting the initial prima facie requirement is 'not especially burdensome.'" Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 12 (1st Cir.2011) (citing Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir.1995); Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir.2003) (describing the prima facie burden under the McDonnell Douglas framework as "not onerous," "easily made," and a "small showing")).

Therefore, applying the traditional standard of causation at this stage, the court finds that Plaintiff's termination in September 28, 2011 was not sufficiently close to her complaint in April 1, 2011, which the court has deemed to be protected conduct on the Plaintiff's part. The First Circuit Court of Appeals had held that temporal proximity of an employee's protected activity to an employer's adverse action is a source of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment hurdle. See Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir.1991). "Where the evidence shows only that the decisionmaker knew of the complainant's protected conduct at the time the

adverse employment action was taken, causation may be inferred from a **very close** temporal relationship between the protected activity and the adverse action." Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 72 (1st Cir.2011) (citations omitted) (emphasis ours). However, "[p]eriods of three or four months have been held to be insufficient to support such an inference." Id. (citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir.2004)). In the case at hand, the Plaintiff's termination became effective three days shy of six months after she lodged her complaints. Because of a lack of chronological proximity, and even taking the "larger picture" into account, the Plaintiff fails to establish the element of causation of her prima facie case of retaliation under Title VII with regards to her termination.

Alternatively, "[i]f a plaintiff makes out a prima facie case of retaliation … , a rebuttable presumption of unlawful retaliation arises and 'the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision.'" Vera v. McHugh, 622 F.3d 17, 32 (1st Cir.2010) (citing Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir.2003)). "In order to rebut that presumption, the employer does not have the burden of persuasion, but must simply produce evidence of a legitimate, nondiscriminatory reason for the employment action." Vera, 622 F.3d at 32 (citing Reeves, 530 U.S. at 142). As previously stated, this court has found that the Defendants successfully set forth legitimate, non-retaliatory, business reasons for her termination, to wit: her performance deficiencies, her failure to adhere to the Firm's rules and her poor personal relationships with her co-workers at MBCD, all of which stem from the factual findings herein.

"If the defendant meets the burden, the plaintiff must then 'show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.'" Rios v. Municipality of Guaynabo, 938 F.Supp.2d 235, 248 (D.P.R. 2013) (citing Roman v. Potter, 604 F.3d 34, 39 (1st Cir.2010)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662-663 (1st Cir.2010) (citing Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)). In her opposition to the Defendants' motion, the Plaintiff only conclusively

states, without more, that the proffered reasons for her termination were pretextual. See Docket No. 75 at page 18.

As per the foregoing, the court finds that, "[e]ven if she had made a prima facie case of retaliation, which she did not, [Defendants] met [their] burden to establish a 'legitimate, non-retaliatory' reason for the termination, so the final burden rests with [Plaintiff] to show that this proffered reason was mere pretext." Ponte, 2014 WL 341166 at *10 (citations omitted). Even viewing the evidence in the light most agreeable to the Plaintiff and giving her the benefit of any and all reasonable inferences, the court finds that she has not met this burden. Consequently, the Defendants' motion for summary judgment is **GRANTED** as to the Plaintiff's retaliation claim under Title VII.

**B. Supplemental State Law Claims**

The remainder of Plaintiff's claims are grounded on Puerto Rico law. Since the federal claims have been dismissed and no other grounds for jurisdiction exist, the court declines to exercise supplemental jurisdiction over the Plaintiff's remaining state-law claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (stating "if the federal claims are dismissed before trial, ... the state law claims should be dismissed as well."). Accordingly, the Plaintiff's claims brought pursuant to Commonwealth law are hereby **DISMISSED WITHOUT PREJUDICE.**

### IV. CONCLUSION

For the reasons stated above, this Court hereby **GRANTS IN PART** Defendants' motion for summary judgment and thus, Plaintiff's claims under Title VII are hereby **DISMISSED WITH PREJUDICE.** The supplemental state-law claims, however, are hereby **DISMISSED WITHOUT PREJUDICE.** Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, February 7, 2014.

S/ JUAN M. PEREZ-GIMENEZ
JUAN M. PEREZ-GIMENEZ
U.S. DISTRICT JUDGE